## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI

In re:                                  )
                                        )
    **MARITIME**                          )    **Case No. 11-13463-DWH**
    **COMMUNICATIONS/LAND**               )
    **MOBILE, LLC,**                      )    **Chapter 11**
                                        )
        **Debtor.**             )

### EMERGENCY MOTION TO AUTHORIZE
### FINANCING PURSUANT TO 11 U.S.C. § 364

Maritime Communications/Land Mobile, LLC (the "Debtor" or the "Movant"), moves the Court, pursuant to 11 U.S.C. § 364(d) to authorize the Debtor to obtain credit from Southeastern Commercial Finance, L.L.C (the "Lender") that is secured by a senior or equal lien on property of the estate.  In further support of this Motion, the Movant states as follows:

### Procedural Posture and Jurisdiction

1. On August 1, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, § 101, *et seq*. (the "Bankruptcy Code").

2. The Movant brings this Motion under Section 364(d) of the Bankruptcy Code and Bankruptcy Rule 4001(c).

3. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).  This matter is a core proceeding under 11 U.S.C. § 157(b)(2).

4. Venue of this matter is proper in this Court pursuant to 28 U.S.C. §§1408 and 1409(a).

### Facts

5. The Debtor owns and operates numerous licenses for wireless and cellular services.

6. The Debtor's assets primarily include Federal Communications Commission licenses (the "Licenses").

7. The Debtor generates revenue from the Licenses (the "Revenue Stream").

8. The monthly Revenue Stream is approximately $400.00/month.

9. The Debtor desires to obtain, and the Lender desires to extend, a loan in the original principal amount of $150,000.00 (the "DIP Loan").

10. The Loan is evidenced by that certain Debtor in Possession Loan and Security Agreement attached hereto as Exhibit A (the "DIP Loan Agreement") and a resulting Promissory Note that will be executed (the "DIP Note" and together with the Loan Agreement, collectively, the "DIP Loan Documents"). The DIP Loan Documents are not yet finalized as to all details but they set forth the essence of the transaction.

11. The DIP Loan is necessary for the Debtor to continue to operate its business and reorganize its debts and obligations.

12. Specifically, Debtor seeks to pay its trade creditors, post-petition operating costs and administrative expenses with proceeds from the DIP Loan (the "Expenses").

13. The Debtor is not able to obtain credit except as provided under the terms of the DIP Loan Documents with Lender.

B BDB2 987209 v1 1039343-000015  08/16/2011

14. The Revenue Stream may be encumbered by a first lien held by Pinnacle Bank (the "First Lienholder").

15. The First Lienholder's interest in the Revenue Stream is adequately protected by the equity in the Revenue Stream and all other collateral it holds (assuming it is properly perfected therein).

## Motion to Authorize Obtaining of Credit

16. Authorization of the DIP Loan will provide the Debtor with immediate and ongoing access to borrowing availability to pay the Expenses during the administration of this chapter 11 case and pending the court's approval of the Debtor's plan of reorganization. Unless these expenditures are made, the Debtor could be forced to cease operations, which could result in irreparable harm to its business and substantial deterioration of the value of its enterprise to the detriment of its estate, its employees, its creditors, and its stockholders.

17. As set forth above, the Debtor proposes to obtain the proposed debtor-in-possession financing pursuant to sections 364(d) of the Bankruptcy Code; the Lender is willing to provide debtor-in-possession financing to the Debtor in exchange for a superpriority secured claim and a perfected first priority lien in the Debtor's assets, including the Revenue Stream (the "Collateral").

18. Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) or (2) of the Bankruptcy Code, the court may authorize the debtor to obtain

B BDB2 987209 v1 1039343-000015   08/16/2011

credit with priority over all secured creditors of the Debtor or incur debt secured by a lien on property of the estate that is not otherwise subject to a lien. 11 U.S.C. § 364(d) and 364(c)(2). The Debtor's immediate working capital needs can be satisfied only if the Debtor is immediately authorized to borrow $150,000.00 under the DIP Loan Agreement and to use such proceeds to fund its operations, pursuant to the attached Monthly Budget marked as Exhibit "B." The Debtor submits that it is unable to obtain the funds to be provided under the DIP Loan Agreement on more favorable terms than those contained in the DIP Loan Agreement. Although the Debtor did not actively seek to obtain funds on an unsecured basis, the Debtor believes, given the circumstances of this case, that it could not (i) obtain the required funds in the ordinary course of business on an unsecured basis allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense, or (ii) obtain the required funds in the non-ordinary course as an administrative expense allowable under section 503(b)(1) of the Bankruptcy Code. *See* 11 U.S.C. § 364(a),(b).

19. The Debtor also believes that the terms offered by the Lender are significantly more favorable than any terms that would be offered by other lenders. The Debtor submits that the circumstances of this case requires the Debtor to obtain financing under sections 364(d) of the Bankruptcy Code, and accordingly, the DIP Loan Agreement reflects the exercise of its sound business judgment. Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in exercising its sound business judgment. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be

B BDB2 987209 v1 1039343-000015  08/16/2011

utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."). *See also In re Funding Sys. Asset Mgmt. Corp.*, 72 B.R. 87, 88 (Bankr. W.D. Pa. 1987); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981). Here, the Debtor has determined that financing is available only under section 364(d) of the Bankruptcy Code and that entering into the DIP Loan Agreement is in the best interests of the Debtor and its estate.

20. The Debtor negotiated with the Lender at arms-length, in good faith and pursuant to its sound business judgment. The terms and conditions of the DIP Loan Agreement are fair and reasonable under the circumstances. Accordingly, the Lender and all obligations incurred under the DIP Loan Agreement should be afforded the benefits of section 364(e) of the Bankruptcy Code.

## The Interim Authorization Should Be Granted

21. Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit may not be commenced earlier than 15 days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing. Pursuant to Bankruptcy Rule 4001(c), the Debtor requests that the Court (a) conduct an expedited preliminary hearing on the Motion and authorize the Debtor to borrow $150,000.00 on an interim

basis to (i) maintain and finance the ongoing operations of the Debtor, and (ii) avoid immediate and irreparable harm and prejudice to the Debtor's estate and all parties in interest, and (b) schedule a final hearing on the relief requested herein.

22. Absent authorization from the Court to obtain the DIP Loan pending a final hearing, the Debtor will be immediately and irreparably harmed.  As set forth above, the Debtor's ability to enter into the DIP Loan Agreement is critical to the success of its chapter 11 case, its ability to reorganize, and the ability to preserve any value for its creditors. Without immediate liquidity provided by access to the DIP Loan, the Debtor will simply be unable to conduct normal business operations, and its estate, creditors, employees, and equity holders will be immediately and irreparably harmed.

WHEREFORE, PREMISES CONSIDERED, the Debtor respectfully prays that upon an expedited hearing hereof, this Court will enter its Order granting the Motion on an interim basis and then, upon a final hearing, the Court will enter its final order approving the Motion. The Debtor prays for general relief.

This, the _____ day of August, 2011.

Respectfully submitted,

MARITIME COMMUNICATIONS/LAND MOBILE, LLC

By Its Attorneys,
HARRIS JERNIGAN & GENO, PLLC

By_____
    Craig M. Geno

6

OF COUNSEL:

Craig M. Geno, Esq.; MSB No. 4793
Harris Jernigan & Geno, PLLC
587 Highland Colony Parkway (39157)
P. O. Box 3380
Ridgeland, MS 39158-3380
601-427-0048 - Telephone
601-427-0050 – Facsimile

## CERTIFICATE OF SERVICE

I, Craig M. Geno, do hereby certify that I have caused to be served this date, via electronic filing transmission, a true and correct copy of the above and foregoing to the following:

Sammye S. Tharp, Esq.
Office of the United States Trustee
Sammye.S.Tharp@usdoj.gov

THIS, the 30th day of August, 2011.

_____
Craig M. Geno

## DEBTOR IN POSSESSION
## LOAN AND SECURITY AGREEMENT

This **DEBTOR IN POSSESSION LOAN AND SECURITY AGREEMENT** (this "Agreement") is made this day August 30, 2011 (the "Closing Date") by and between SOUTHEASTERN COMMERCIAL FINANCE, L.L.C., ("Lender"), an Alabama limited liability company, with an office at 110 12th Street North, Birmingham, Alabama 35203, and MARITIME COMMUNICATIONS/LAND MOBILE, LLC ("Borrower") a Delaware limited liability company, with its chief executive office and principal place of business at 206 Eight Street North, Columbus, Mississippi, 39701. Capitalized terms used in this Agreement and not otherwise defined herein have the meanings assigned to them in **Exhibit A**, General Definitions.

## ARTICLE I
## THE LOAN

1.1    Loan.

(a) Subject to the following terms and conditions, Lender agrees to extend credit and otherwise make a loan to Borrower in the original principal of $150,000.00 (the "Loan").

(b) The Loan will be evidenced by a Promissory Note payable to the order of Lender and maturing on the earliest of (collectively, the "Maturity Date"): (a) the date that is six months after the Closing Date; (b) the date a sale of substantially all the assets of Debtor, pursuant to Section 363 of the Bankruptcy Code, is closed; and (c) the effective date of a plan of reorganization, which is confirmed by the Bankruptcy Court, pursuant to Section 1129 of the Bankruptcy Code. Notwithstanding the foregoing, Lender shall have the right to terminate its obligations under this Agreement immediately and without notice, except as otherwise provided in this Agreement, upon the occurrence and during the continuation of an Event of Default.

(c) The principal amount of the Loan shall bear interest at the Prime-Based Rate. Interest shall be payable monthly in arrears on the first day of each month beginning with September 1, 2011, and continuing on the same day of each month as long as any principal remains outstanding (the "Monthly Interest Payment"). The Prime-Based Rate on the Loan shall change as and when the Prime Rate changes. The Prime Rate on the date of this Agreement is _____ percent (____%). The Prime-Based Rate on the date of this Agreement is _____ percent (____%).

(d) In addition to interest and other charges provided for herein, Borrower shall pay to Lender monthly a principal amount equal to $_____ (the "Monthly Principal Payment" and together with the Monthly Interest Payment, collectively, the "Monthly Payment").

1.2    Computation of Interest. Interest on the Loan shall be calculated based on the actual number of days elapsed over a year of 360 days unless reference to a 365 or a 366-day year is necessary in order not to exceed the highest rate permitted by Applicable Law. After the occurrence of an Event of Default, the Loan shall bear interest at the Default Rate.

{01067940.3}
B BDB2 987101 v2
1039343-000015



1.3     Payments.   All sums paid to Lender by Borrower shall be paid in immediately available funds.  Lender shall send Borrower statements of all amounts due under the Loan and those statements shall be considered correct and conclusively binding on Borrower unless Borrower objects within ten (10) days of its receipt of any such statement.

1.4     Disbursements        Lender shall make disbursements under the Note directly to Borrower's creditors in accordance with the Budget set forth as **Exhibit B** (the "Budget").  The Bankruptcy Court, subject to Lender's prior approval, shall approve the Budget in accordance with Section 2.9 herein.

1.5     Collateral.  The Loan, the Note, and the Obligations shall be secured by each of the following, which shall remain valid and binding as security for the aggregate amount of the Obligations outstanding from time to time whether or not the full amount of the Loan is actually advanced by Lender to Borrower a security interest in the Collateral.

## ARTICLE II
## CONDITIONS OF LENDING

Lender shall not be obligated to make the Loan unless at the time the following conditions shall have been met:

2.1     Documentation.  The Loan shall be properly documented and secured, and all Loan Documents shall have been duly executed and delivered, and Lender shall have received each of the following:  (1) certified copies of Borrower's Governing Documents; (2) a certificate of good standing and/or, as applicable, a certificate of existence from the appropriate agency in each state where Borrower conducts business, and (3) any other documents requested by Lender.

2.2     No Default.  No Event of Default shall have occurred and no condition shall exist which would, with the giving of notice or the lapse of time or both become an Event of Default; and neither the business nor assets nor the financial or other condition, of Borrower shall have been adversely affected as the result of any fire, explosion, accident, strike, riot, condemnation, act of God, or any other event or development.

2.3     Reports.  Lender shall have received and approved in Lender's sole discretion all reports and information from Borrower required under this Agreement.

2.4     No Litigation.   No action, proceeding, investigation, regulation or legislation shall have been instituted, threatened or proposed to enjoin, restrain, or prohibit or to obtain damages in respect of the Loan.

2.5     Insurance.  Lender shall have received copies of the casualty insurance policies of Borrower required by this Agreement, together with loss payable endorsements on Lender's standard form of loss payee endorsement naming Lender as loss payee and copies of Borrower's liability insurance policies, together with endorsements naming Lender as a co-insured.

2.6     Authorized Representative Certificates.   On and as of the date of this Agreement, Borrower must have delivered to Lender the following certificates executed by the appropriate Authorized Representatives of Borrower, each of which certificates must be of a current date and must be satisfactory in form and substance to Lender: (a) a certificate confirming compliance by Borrower with the conditions precedent set forth in Section 2.2; (b) a certificate certifying as in full force and effect resolutions of the directors, shareholders, partners, members or other appropriate persons under Borrower's Governing Documents and Applicable Law authorizing the transactions contemplated by the Loan Documents and authorizing certain Authorized Representatives of Borrower to execute the Loan Documents on behalf of Borrower and to act on behalf of Borrower with respect to the Loan Documents, including the authority to request disbursements of the proceeds of the Loan and to direct the disposition of such proceeds; and (c) a certificate certifying as true and correct, as amended, attached copies of Borrower's Governing Documents and the incumbency and signature of each Authorized Representative of Borrower specified in said resolutions.  Lender may conclusively rely on the certified resolutions described in Section 2.6(b) as to all actions on behalf of Borrower by the Authorized Representatives specified therein until Lender has received duly adopted resolutions canceling or amending the prior resolutions.

2.7     Consents.  Lender shall have received consents of the landlords of each parcel leased by Borrower as provided in Section 6.2.

2.8     Lien Search.   Lender shall have received a report from appropriate government offices indicating that there are no Liens against the Collateral except Permitted Liens.

2.9     Bankruptcy Court Approval.  On or prior to the date of such making a disbursement under the Note, the Interim Financing Order or the Final Financing Order, as the case may be, shall have been signed and entered by the Bankruptcy Court, and Lender shall have received a certified copy of same and such order shall be in full force and effect and shall not have been reversed, stayed, modified or amended absent the express written joinder therein or expressly consented thereto in writing, there shall be no motion pending (i) to reverse, modify or amend (without Lender's consent) the Interim Financing Order or the Final Financing Order, (ii) to permit any administrative expense against Debtor to have administrative priority equal to or superior to Lender in respect of the Obligations, or (iii) grant or permit the grant of a Lien on any of the Collateral; and Debtor shall have paid all fees, costs, expenses, and taxes then payable by Debtor, including without limitation, the fees required by this Agreement.

2.10    Additional Documents.  Lender shall have received any additional legal opinions, certificates, instruments and other documents as it may request to evidence (i) compliance by Borrower with the requirements of all Applicable Law, (ii) the truth and accuracy of the representations of Borrower, and (iii) the due performance or satisfaction by Borrower of all agreements required to be performed and all conditions required to be satisfied by Borrower.

# ARTICLE III
## REPRESENTATIONS, WARRANTIES AND GENERAL COVENANTS

Borrower represents, warrants and covenants to and with Lender, which representations, warranties and covenants shall survive until the Obligations are indefeasibly satisfied in full, that:

3.1    Organization and Qualification.  Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the State of its formation, has the company power to own its properties and to carry on its business as now being conducted, and is duly qualified or registered to do business and is in good standing in every jurisdiction in which the character of the properties owned by it or in which the transaction of its business makes its qualification or registration necessary.

3.2    Organizational Power and Authorization.  Subject to approval of the Bankruptcy Court, Borrower is duly authorized to enter into this Agreement.  Borrower has full power and authority to enter into this Agreement, to borrow funds, to execute and deliver the Note and the other Loan Documents, and to incur the obligations provided for in this Agreement, all of which have been authorized by all proper and necessary company action.

3.3    Enforceability.  This Agreement, the Note, and each of the other Loan Documents constitute the valid and legally binding obligation of Borrower enforceable in accordance with their respective terms, and Borrower's execution, delivery and performance thereof will not violate, conflict with, or constitute any default under any Governmental Requirement, Borrower's Governing Documents, or any other agreement or instrument binding upon Borrower or result in the creation or imposition of any Lien upon any of its properties except as contemplated by this Agreement or the other Loan Documents.

3.4    Financial Statements.  The financial statements of Borrower delivered to Lender and all other financial statements and reports furnished to Lender are complete and correct and fairly present the financial condition of Borrower and the results of its operations as of the dates and for the periods referred to and have been prepared in accordance with GAAP applied on a consistent basis throughout the periods involved.  Since the date of the financial statements, no Material Adverse Change has occurred.  Borrower has no liability, direct or contingent, that is material in amount and not reflected on Borrower's financial statements.

3.5    Title to Properties.  Borrower has good and marketable title to all of its assets, including the Collateral, subject to no Lien, mortgage, pledge, encumbrance, or charge of any kind except inchoate Liens arising by operation of law for obligations which are not yet due and except for Permitted Liens.

3.6    Taxes.  Borrower has filed all federal, state and local tax returns which are required to be filed and has paid all Taxes which are due to any taxing authority, including, without limitation, all applicable federal, state, and local employee withholding taxes and all federal excise taxes.  All such returns are complete and accurate in all respects.

3.7    Litigation.   There are no actions, suits or proceedings (whether or not purportedly on its behalf) pending or, to the best of its knowledge, threatened against or affecting Borrower, by or before any Governmental Authority or in or under any other jurisdiction, court or otherwise, that involve any of the transactions contemplated by the Loan Documents or the possibility of any judgment or liability in excess of $25,000 or that might reasonably be expected to result in any Material Adverse Change; and Borrower is not, to the best of its knowledge, in default with respect to any Governmental Requirement.

3.8    Agreements.   Borrower is not a party to any agreement or instrument, or subject to any restriction in Borrower's Governing Documents that materially and adversely affects its business, operations, properties or condition, financial or otherwise, and it is not in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party, which default might reasonably be expected to have a Material Adverse Effect.

3.9    Federal Reserve Board Regulations.   Borrower does not intend to use any part of the proceeds of the Loan, and has not incurred any indebtedness to be reduced, retired or purchased by it out of such proceeds, for the purpose of purchasing or carrying any Margin Stock, and it does not own or has no intention of acquiring any such Margin Stock.

3.10    Investment Company Act.   It is not an "investment company," or a company "controlled" by an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended.

3.11    ERISA.

(a) The execution and delivery of this Agreement and the issuance and delivery of the Note as contemplated hereby will not involve any prohibited transaction within the meaning of ERISA or Section 4975 of the Internal Revenue Code, as amended.

(b) Based on ERISA and the regulations and published interpretations thereunder, it is in compliance in all material respects with the applicable provisions of ERISA.

(c) No "Reportable Event," as defined in Section 4043(b) of Title IV of ERISA, has occurred with respect to any plan maintained by it.

3.12    Location/Organization.   The addresses of (a) each of Borrower's places of business, (b) Borrower's chief executive office, (c) the office where Borrower keeps Borrower's records concerning Accounts, (d) Borrower's registered agent, and (e) each location where Borrower keeps any Tangible Property, are correctly and completely set forth on **Exhibit D**. No change has occurred in (x) such address(es) in the five years immediately preceding the execution of this Agreement, (y) Borrower's legal name is a set forth in the first paragraph of this Agreement, or (z) Borrower's state of incorporation or registration (if Borrower was created by such state filing) is the following state: Delaware identified in the Certificate of Borrower's Legal Name and Location delivered to Lender at the execution of this Agreement.

3.13   <u>General Representations and Warranties</u>.  (a) All material Contracts to which Borrower is a party are accurately described in Part 1 of **Exhibit E**, (b) all of Borrower's patents, patent applications, trademarks, trade names, service marks, logos, copyrights, copyright applications and all of Borrower's material registrations, licenses, permits and franchises, are accurately described in Part 2 of **Exhibit F**, (c) all Leases in which Borrower is the lessor are accurately described in Part 3 of **Exhibit G**, and (d) all Leases in which Borrower is the lessee are accurately described in Part 4 of **Exhibit E**.

3.14   <u>Borrower's Name</u>.  Borrower has not changed its name or been known by any other name within the last five (5) years, nor has it been the surviving corporation in a merger effected within the last five (5) years.  Borrower has never used any trade or fictitious name in the conduct of its business.

3.15   <u>Consents, Registrations, Approvals, etc</u>.  No registration with or consent or approval of, or other action by, any Governmental Authority is required for the execution, delivery and performance of any Loan Documents to which it is a party.

3.16   <u>Environmental Matters</u>.

(a) Borrower has never caused or knowingly permitted any Hazardous Substance to be placed, held, located, released or disposed of in violation of any Governmental Requirement on, under or at any real property legally or beneficially owned, leased or operated by it, and such property has never been used by it or, to the best of its knowledge, by any other person as a dump site or permanent or temporary storage site for any Hazardous Substance, in violation of any Governmental Requirement.

(b) To the best of its knowledge, Borrower has no liabilities with respect to Hazardous Substances, and no facts or circumstances exist that could give rise to liabilities with respect to Hazardous Substances.

3.17   <u>Patents, Trademarks</u>.  Borrower owns, or possesses the right to use, all the patents, trademarks, service marks, trade names, copyrights, franchises, consents, authorizations and licenses and rights with respect to the foregoing, necessary for the conduct of its business as now conducted and proposed to be conducted, without any known conflict with the rights of others.

3.18   <u>Solvency</u>.  Borrower is and will remain Solvent, taking into account the transactions contemplated by the Loan Documents.

3.19   <u>Subsidiaries</u>.  Borrower has no Subsidiaries.

3.20   <u>Pledge of Receivables</u>.  Borrower has not pledged its Accounts as collateral security for any loan, Indebtedness or obligation other than the Loan.

3.21   <u>Ownership</u>.  The ownership interests of the Persons comprising Borrower and each of the respective interests in Borrower are correctly and accurately set forth on Exhibit F attached hereto and made a part hereof.

3.22   <u>Fraudulent Conveyances</u>.   Borrower (a) has not entered into this Agreement or any of the other Loan Documents with the actual intent to hinder, delay, or defraud any creditor and (b) has received reasonably equivalent value in exchange for its obligations under the Loan Documents.   Giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and mature.   Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including, without limitation, contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of Borrower).

3.23   <u>Compliance with Anti-Terrorism, Embargo, Sanctions and Anti-Money Laundering Laws</u>.   Borrower, and to the best of Borrower's knowledge, after having made diligent inquiry, (a) each Person owning an interest of 20% or more in Borrower, (b) each guarantor, and (c) each tenant at any real property owned by it, if any: (i) is not currently identified on OFAC List, and (ii) is not a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States.   Borrower has implemented procedures, and will consistently apply those procedures throughout the term of the Loan, to ensure the foregoing representations and warranties remain true and correct during the term of the Loan.

3.24   <u>Representations True</u>.   No representation or warranty by Borrower in this Agreement or in any Loan Document or related certificate contains any untrue statement of material fact or omits to state a material fact necessary to make such representation or warranty not misleading in light of the circumstances under which it was made; and there is no fact known to Borrower that Borrower has not disclosed to Lender that has a Material Adverse Effect or, so far as Borrower can now reasonably foresee, will have a Material Adverse Effect.

3.25   <u>Continuing Obligations</u>.   All representations, warranties and general covenants contained in this Article III shall be deemed continuing and ongoing.   Borrower shall maintain the obligation to timely notify Lender if any representation, warranty or general covenant becomes false or misleading in any respect.

**ARTICLE IV**
**GENERAL COVENANTS**

Borrower agrees and covenants that until the Obligations have been indefeasibly paid in full and until Lender has no further obligation to make advances under the Loan, Borrower shall:

4.1 <u>Payment of Loan/Performance of Loan Obligations</u>.   Duly and punctually pay or cause to be paid the principal and interest of the Note in accordance with its terms and duly

{01067940.3}

and punctually pay and perform or cause to be paid or performed all Obligations hereunder and under the other Loan Documents.

4.2   Insurance.   Maintain insurance covering all Collateral against risk of fire (including so-called extended coverage), theft, water damage and such other risks as Lender may require and, in the case of motor vehicles, against risk of collision and vandalism, in such form, for such perils, and written by such companies as may be satisfactory to Lender in Lender's sole discretion.   Lender shall be named as loss payee under each insurance policy. All policies of insurance shall provide for a minimum 30 days' written notice to Lender before cancellation.   At request of Lender, Borrower shall deliver such policies, or at Lender's option, certificates of those policies, to Lender to be held by it.   Borrower hereby appoints Lender the attorney-in-fact for Borrower for purposes of obtaining, adjusting, settling, and canceling such insurance and of endorsing in Borrower's name and giving receipt for checks and drafts issued in payment of losses and as return premiums.   In the event Borrower fails to provide any required insurance, Lender may, at its option, purchase such insurance or insurance covering only Lender's interest in the Collateral.   Borrower shall reimburse Lender on demand for the cost of such insurance. By this Agreement, Borrower assigns all insurance policies at any time covering the Collateral and all return or unearned premiums to Lender as additional security for the Obligations.   The risk of loss or damage to the Collateral is on Borrower whether or not the Collateral is held by or controlled by Lender.

4.3   Corporate Existence; Qualification.   Maintain its corporate existence and, in each jurisdiction in which the character of the property owned by it or in which the transaction of its business makes its qualification necessary, maintain good standing.

4.4   Taxes.   During each fiscal year, accrue all current tax liabilities, all required withholding of income taxes of employees, all required old age and unemployment contributions, all required payments to employee benefit plans, and pay the same when they become due.

4.5   Compliance with Laws.   Comply with all Applicable Laws, including, without limitation, Environmental Regulations, and pay when due all taxes, assessments, charges, claims for labor, supplies, rent, and other similar obligations.   Borrower shall pay when due all taxes and assessments upon the Collateral, this Agreement, the Note, or any Loan Document, including, without limitation, any stamp taxes or intangibles taxes imposed by virtue of the Loan or any Loan Document and all federal excise taxes.

4.6   Financial Statements.   Within thirty (30) days after the close of each fiscal year, furnish Lender with annual compiled financial statements consisting of balance sheets, operating statements and such other statements as Lender may reasonably request, prepared in accordance with GAAP consistently applied for the period involved and for the preceding fiscal year and certified as correct by independent certified public accountants acceptable to Lender. Within fourteen (14) days after the close of each calendar month, furnish Lender with unaudited monthly and year-to-date financial statements, consisting of balance sheets and operating statements and a listing of all contingent liabilities for the periods involved and such other statements as Lender may request, prepared in accordance with GAAP applied on a basis consistent with the financial statement(s) previously furnished to Lender, taken from the books

{01067940.3}

and records of Borrower, and certified as correct by the chief financial officer of Borrower. In addition, Borrower shall furnish to Lender within fourteen (14) days after the same are filed, all federal and state tax returns and informational reports, including, without limitation, the Form 741 quarterly payroll tax information form and all other forms filed with any state, federal, or local agency pertaining to payment of applicable payroll and other federal, state and local Taxes. Borrower shall also furnish to Lender copies of all pleadings, motions, applications and other papers filed with the Bankruptcy Court, and monthly operating statements filed with the United States Trustee, on or promptly after the date such documents are filed.

4.7     Visits and Inspections.  Permit persons designated by Lender to inspect the property and books and records of Borrower and to discuss its affairs with its officers and employees and furnish Lender with such miscellaneous information as it may request.

4.8     Books and Records.  Keep and maintain at all times at its principal place of business, and upon Lender's request make available to Lender, complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the results of its business operations, and copies of all written contracts, leases (if any), and other instruments which affect the Collateral, which books, records, contracts, leases (if any) and other instruments shall be subject to examination and inspection at any reasonable time by Lender (upon reasonable advance notice, which for such purposes only may be given orally, except in the case of an emergency or following an Event of Default, in which case no advance notice shall be required); provided, however, that if an Event of Default has occurred and is continuing, Borrower shall deliver to Lender upon written demand all books, records, contracts, leases (if any) and other instruments relating to the conduct of its business and Borrower authorizes Lender to obtain a credit report on Borrower at any time.

4.9     Payment of Indebtedness.  Duly and punctually pay or cause to be paid all other Indebtedness now owing or hereafter incurred by Borrower in accordance with the terms of such Indebtedness, except such Indebtedness owing to those other than Lender which is being contested in good faith and with respect to which any execution against properties of Borrower has been effectively stayed and for which reserves and collateral for the payment and security thereof have been established in sufficient amounts as determined by Lender in its sole commercially reasonable discretion.

4.10    Records of Accounts.  Maintain all records, including records pertaining to the Accounts of Borrower, at the principal place of business of Borrower as set forth in this Agreement.

4.11    Conduct of Business.  Conduct its business as now conducted and do all things necessary to keep in full force and effect its rights, privileges and franchises necessary to continue its business.

4.12    Maintenance of Properties.  Maintain, preserve and protect all franchises and trade names and preserve all the remainder of its property used or useful in the conduct of its business and keep the same in good repair, working order and condition, and from time to time make, or cause to be made, all needful and proper repairs, renewals, replacements, betterments

and improvements thereto, so that the business carried on in connection therewith may be properly and advantageously conducted at all times.

4.13   Payment of Indebtedness, Taxes, etc.   (a) Pay its indebtedness and obligations in accordance with normal terms; (b) pay all Taxes, assessments and governmental charges or levies imposed upon it or upon its income and profits or upon any of its properties before they become in default; and (c) pay all lawful claims for labor, materials and supplies or otherwise, which, if unpaid, might become a Lien upon any of its properties.

4.14   Litigation Notice.   Promptly notify Lender of any action, suit or proceeding at law or in equity or by or before any Governmental Authority that, if adversely determined, might reasonably be expected to impair its ability to perform its obligations under any of the Loan Documents to which it is a party, might reasonably be expected to impair its right to carry on its business substantially as now conducted, or might reasonably be expected to result in a judgment against Borrower in an amount in excess of $25,000 or have a Material Adverse Effect.

4.15   Borrower's Report.   Furnish to Lender at least weekly (and more frequently if requested by Lender, and in any event at the time of any draw request) a summary and/or detailed accounts receivable aging report (according to Lender's request), a detailed accounts payable aging report, and an inventory report, all in form and substance, and containing such detail and information, as Lender shall request, and furnish to Lender all physical inventory listings prepared by Borrower. All Borrower's Reports shall be certified by an Authorized Representative of Borrower as true and accurate. Lender will rely on the Borrower's Reports to extend or renew the Loan, and Borrower hereby acknowledges that any certified Borrower's Report containing materially false information that is forwarded to Lender shall be done so with an intent by Borrower to deceive Lender.

4.16   Collection of Accounts.   Diligently pursue collection of all Accounts.

4.17   Notice of Default.   Promptly notify Lender of the existence of any Event of Default, or any event that upon notice or lapse of time or both would constitute an Event of Default.

4.18   Further Assurances.   At its cost and expense, upon request of Lender, duly execute and deliver, or cause to be duly executed and delivered, to Lender such further instruments and do and cause to be done such further acts as may be reasonably necessary or proper in the opinion of Lender or its counsel to carry out more effectively the provisions and purposes of the Loan Documents.

4.19   Compliance with Applicable Law and Court Orders.   Comply with applicable law, and comply with all orders of the Bankruptcy Court.

# ARTICLE V
## NEGATIVE COVENANTS

Until the Obligations have been indefeasibly paid in full and until Lender has no further obligation to make advances under the Loan, Borrower shall not:

5.1    Indebtedness. Create, incur, assume or suffer to exist any Indebtedness or obligation for money borrowed, or guarantee, or endorse, or otherwise be or become contingently liable in connection with the obligations of any Person, except

5.1.1    Indebtedness for Taxes not yet due, or which are being actively contested in good faith by appropriate proceedings and against which reserves deemed adequate by Lender in Lender's sole discretion have been established by Borrower, but only if the nonpayment of Taxes does not result in a Lien upon any property of Borrower that has priority over the Lien held by Lender;

5.1.2    Contingent liabilities arising out of the endorsement of negotiable instruments in the ordinary course of collection;

5.1.3    Accounts payable to trade creditors which are not aged more than one hundred twenty (120) days from billing date and current operating expenses (other than for borrowed money) which are not more than sixty (60) days past due, in each case incurred in the ordinary course of business and paid within such time period; and

5.1.4    Debt to third parties for purchase money borrowing incurred in connection with the purchase of capital assets not to exceed $5,000.00 during any fiscal year.

5.2    Transfers, Liens, and Security Interests. Sell, lease, transfer, convey or otherwise dispose of any of the Collateral, except for the sale of Inventory in the ordinary course of business, create, incur, assume, or suffer to exist any mortgage, security deed, deed of trust, security interest, pledge, encumbrance, Lien or charge of any kind (including charges on property purchased under conditional sales or other title-retention agreements) on any of its property or assets, except for Permitted Liens.

5.3    Dividends and Distributions. Declare any dividends on any of its capital stock, or apply any of its property or assets to the purchase, redemption or other retirement of its capital stock; provided, however, that during any period that Borrower maintains an "S" election under the Internal Revenue Code of 1986, as amended, Borrower shall be entitled to distribute to its shareholders in each year an amount not to exceed that portion of the federal income tax liability incurred by each said shareholder on income tax returns for the prior year which resulted from its holdings of shares in Borrower.

5.4    Financing Statements. Permit any financing statement or lien (except Lender's financing statements) to be on file with respect to the Collateral, or file a release, amendment, partial release, or termination statement with respect to any of the Collateral without Lender's prior written consent.

5.5     Location of Collateral. (a) Change the locations set forth on **Exhibit D** at which the Collateral is maintained; (b) change the name, identity, or corporate structure of Borrower or adopt or make use of any fictitious or trade name not disclosed elsewhere in this Agreement; (c) change the location of its chief executive office or the state of its incorporation or formation (if Borrower was created by such state filing); (d) engage in any business other than the business now being conducted by it and other businesses directly related thereto without Lender's prior written consent, which shall not be unreasonably withheld; (e) remove its principal place of business or business records from [County], [State], unless the removal is pursuant to a merger, consolidation or transfer of assets approved by Lender; or (f) enter into (1) any agreement whereby the management, supervision or control of its business is delegated to or placed in any person other than its governing body and officers or (2) any contract or agreement whereby any of its principal functions are delegated to or placed in any agent or independent contractor.

5.6     Destruction of Collateral. Waste or destroy any of the Collateral or use any of such Collateral in violation of any Applicable Law.

5.7     Merger or Consolidation.   Enter into any agreement of merger or consolidation or acquire substantially all of the assets of any Person.

5.8     Investments. Purchase any interest, whether stock or debt, in any Person, except direct obligations of the United States of America, certificates of deposit issued by a bank or other financial institution, or money market funds investing in short-term debt instruments.

5.9     Subsidiary Transactions.   Create any Subsidiary or divest itself of any assets by transferring them to a Subsidiary.

5.10    Partnerships or Joint Ventures. Become a general or limited partner in any general or limited partnership or a joint venturer in any joint venture.

5.11    Transactions with Related Persons. Enter into any transaction with any guarantor or any officer, director, partner, member or Affiliate unless the terms of that transaction are no less favorable to it than those that would be obtained on an arms-length basis.

5.12    Use of Credit Proceeds. Directly or indirectly use any part of the proceeds of the Loan (a) for any purpose other than general working capital, refinancing of existing Loan used for the acquisition of real property and equipment and for the future acquisition of real property or (b) without limiting the generality of the foregoing, for the purpose of purchasing or carrying any Margin Stock, or of reducing, retiring or purchasing any indebtedness incurred for such purpose; or take any other action that would involve a violation of Section 7 of the Securities Exchange Act of 1934, as amended, or any regulation issued thereunder, including Regulation U or Regulation X of the Federal Reserve Board, in connection with the transactions contemplated hereby; provided, however, that nothing set forth in this Section 5.12 or elsewhere in this Agreement shall be construed as imposing any duty on Lender to supervise the use or application of the Loan proceeds or any liability of Lender to any person if the Loan proceeds are not used for the purposes set forth in this Agreement.

## ARTICLE VI
## GRANT OF SECURITY INTEREST

6.1   Security Interest.   As security for the payment of the Loan and all other Obligations, now existing or in the future incurred, and including any extensions or renewals or changes in form of the Loan, and any other Indebtedness of Borrower to Lender, and all costs and expenses of collection thereof, including, without limitation, attorneys' fees, Borrower hereby assigns to Lender and grants to Lender a security interest in the Collateral.  The rights assigned and granted to Lender hereunder include, but shall in no way be limited to, all of Borrower's right to (1) modify or amend the Contracts; (2) terminate the Contracts; and (3) waive or release the performance or observance of the obligations of any party under the Contracts, or any guaranty or security therefor and such rights shall include any security interests granted to Borrower in any of the Contracts.

6.2   Lien Perfection; Further Assurances.   Borrower authorizes Lender to perfect, preserve, continue, amend, and maintain Lender's interest in the Collateral and shall assist and cooperate with Lender in taking such actions and shall pay all costs and expenses incurred by Lender in taking such actions.  Such actions may include but are not limited to (1) the filing by Lender of financing statements describing the Collateral; (2) Lender's taking possession of the Collateral; (3) Borrower's obtaining an acknowledgement from a person in possession of any of the Collateral that such person is holding the Collateral for the benefit of Lender; and (4) Lender's obtaining control of the Collateral consisting of Deposit Accounts, Investment Property, letter-of-credit rights, and electronic chattel paper.  Borrower shall place a legend in form and substance acceptable to Lender that gives notice of Lender's security interest in chattel paper (tangible or electronic) on all chattel paper (tangible or electronic) currently existing or acquired or created in the future by Borrower.  Borrower shall file and hereby authorizes Lender to file such UCC-1 financing statements and other documents as are required to perfect, preserve, amend, maintain or continue Lender's Lien upon any of the Collateral and shall take such other action as may be required to perfect or to continue the perfection of Lender's lien upon the Collateral.  The parties agree that a carbon, photographic or other reproduction of this Agreement shall be sufficient as a financing statement and may be filed in any appropriate recording office.  Borrower agrees to obtain such estoppel certificates, lien waivers, and subordination agreements from each of Borrower's landlords as shall be necessary to release the Collateral from any claim or interest of said landlords.  Part of the Collateral may constitute motor vehicles and other vehicles subject to registration under the motor vehicle title registration statutes of various states.  Borrower agrees to execute and deliver on a timely basis all title certificates and instruments as are necessary to convey to Lender a first priority perfected security interest in those vehicles.  At Lender's request, Borrower shall also promptly execute or cause to be executed and shall deliver to Lender any additional documents, instruments and agreements deemed necessary by Lender to give effect to or carry out the terms or intent of the Loan Documents.  Borrower shall not file a release, amendment, partial release, or termination statement with respect to any of the Collateral without Lender's prior written consent.  Borrower agrees that whenever any of the Collateral is in the possession of Lender whether for perfection, enforcement or otherwise, Borrower agrees to Lender's unrestricted use and operation of the Collateral and agrees that Lender shall have no duty to keep the Collateral segregated or

separately identifiable and that Lender may commingle such Collateral with its own without any liability to Borrower for so doing.

6.3     Borrower's Permitted Use of Collateral.   Borrower shall have no right to use or dispose of the Petition Collateral or any portion thereof, without the prior written consent of Lender.

6.4     No Identification Required.   No submission by Borrower to Lender of a schedule or other particular identification of Collateral shall be necessary to vest in Lender security title or a security interest in each and every item of Collateral now existing or hereafter created and acquired by Borrower, but rather such title and security interest shall vest in Lender immediately upon the creation or acquisition of any item of Collateral hereafter created or acquired by Borrower, without the necessity for any other or further action by Borrower or by Lender.  Borrower shall take such steps and observe such formalities as Lender may request from time to time to create and maintain in favor of Lender a valid and first lien upon, security interest in and pledge of all of the Collateral and all other security that Borrower may grant to Lender, whether now existing or created or acquired from time to time hereafter.

6.5     Superpriority.   Debtor hereby agrees that the Obligations shall constitute allowed administrative expenses in the Bankruptcy Case, and pursuant to Section 364(c)(1) of the Bankruptcy Code, shall have priority over any and all administrative expenses of any kind and nature specified in Section 503(b) or 507(b) of the Bankruptcy Code, subject, as to priority, only to (a) U.S. Trustee Fees, and (b) allowed Professional Expenses.

6.6     Status, Survival and Perfection of Liens.   All Liens and security interests granted hereunder shall be deemed validly perfected against Debtor, the Estate, any trustee appointed in the Bankruptcy Case, Borrowers' successors and assigns and all creditors and parties in interest in the Bankruptcy Case.  Lender shall not be required to file financing statements or making recordings on real property records to perfect the liens and security interests granted hereunder.   Notwithstanding the foregoing, Lender may file financing statements and make recordings on real property records to evidence the Liens and security interests granted hereunder, and Debtor shall cooperate with Lender in executing and delivering such documents as Lender may reasonably require to make such filings.  The Liens and security interests granted to Lender shall be legal, valid, continuing and fully-perfected first priority Liens on the Collateral, which shall be subject to no other Liens, whether now existing or hereafter arising, except the Permitted Liens.  The Liens and security interests granted hereunder shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by Debtor (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Bankruptcy Case, or by any act or omission whatsoever. No claim of any kind or nature, including without limitation claims under Section 506(c) of the Bankruptcy Code, shall be asserted against Lender's Liens and security interests in the Collateral, except for (a) U.S. Trustee Fees, and (b) allowed Professional Expenses.

# ARTICLE VII
## ADDITIONAL REPRESENTATIONS, COVENANTS, AND AGREEMENTS RELATING TO COLLATERAL

7.1 <u>Reliance on Statements</u>.   With respect to all Accounts, Borrower represents and warrants to Lender that Lender may rely, in determining which Accounts are Eligible Accounts, on all statements made by Borrower, and unless otherwise indicated in writing to Lender, that with respect to each Account:

7.1.1   It is genuine and in all respects what it purports to be, and it is not evidenced by a judgment;

7.1.2   It arises out of a completed, bona fide sale and delivery of goods or rendition of services by Borrower in the ordinary course of its business and in accordance with the terms and conditions of all purchase orders, contracts or other documents relating thereto and forming a part of the contract between Borrower and the Account Debtor;

7.1.3   It is for a liquidated amount maturing as stated in the duplicate invoice covering such sale or rendition of services, a copy of which has been furnished or is available to Lender;

7.1.4   Such Account, and Lender's security interest in the Account, is not, and will not be in the future, subject to any offset, Lien, deduction, defense, dispute, counterclaim or any other adverse condition and each such Account is absolutely owing to Borrower and is not contingent in any respect or for any reason;

7.1.5   Borrower has made no agreement with any Account Debtor for any deduction from the Account, except discounts or allowances which are granted by Borrower in the ordinary course of its business for prompt payment and which are reflected in the calculation of the net amount of each invoice;

7.1.6   There are no facts, events or occurrences which in any way impair the validity or enforceability of the Account or tend to reduce the amount payable from the face amount of the invoice representing the Account;

7.1.7   To the best of Borrower's knowledge, the Account Debtor (i) had the capacity to contract at the time any contract or other document giving rise to the Account was executed and (ii) such Account Debtor was and is Solvent;

7.1.8   Borrower has no knowledge of any fact or circumstance which would impair the validity or collectibility of the Account, and to the best of Borrower's knowledge there are no proceedings or actions which are threatened or pending against any Account Debtor which might result in any material adverse change in Account Debtor's financial condition or the collectibility of the Account;

7.1.9   Borrower will have paid or provided for the payment of all Taxes arising from the transaction creating the Account; and

7.1.10  The Account otherwise qualifies as an Eligible Account as defined in this Agreement.

7.2     Affirmation of Representations.  Each request for a loan or advance made by Borrower pursuant to this Agreement or any of the other Loan Documents shall constitute (i) an automatic representation and warranty by Borrower to Lender that there does not then exist any Event of Default and (ii) a reaffirmation as of the date of said request that all of the representations and warranties of Borrower contained in this Agreement and the other Loan Documents are true in all respects.

7.3     Administration of Inventory.  Until the occurrence of an Event of Default, Borrower may use and dispose of the Inventory in the ordinary course of its business, provided that the ordinary course of business does not include a transfer in satisfaction of Indebtedness nor transfer to an Affiliate of Borrower.  Borrower shall not store any Inventory with a bailee, warehouseman or similar party without Lender's prior written consent, and if Lender give such consent, Borrower shall concurrently therewith cause any such bailee, warehouseman or similar party to issue and deliver to Lender, in form and substances acceptable to Lender, warehouse receipts therefor in Lender's name and an acknowledgment from such bailee, warehouseman or similar party indicating that such person is holding such Collateral for the benefit of Lender.

7.4     Administration of Accounts.

7.4.1  Deposit of Accounts.  All checks, remittances, payments, and funds representing Accounts or proceeds of Accounts shall be deposited into the Collection Account, and Borrower shall take such steps as shall be necessary to cause the Depository Bank to report to Lender periodically items that are deposited to the Collection Account and the balance in that account.  Borrower hereby grants to Lender a first priority security interest in and control of any of Borrower's Deposit Accounts, Investment Property, letter-of-credit rights and electronic chattel paper, and Borrower shall take all actions requested by Lender that Lender deems in its sole discretion advisable to establish Lender's control over such Collateral, including obtaining the execution of control agreement by the holder of such Accounts or other Collateral.  Borrower also authorizes Lender to file financing statements describing such Collateral.  Borrower shall cause Depository Bank to sign an agreement with Lender acknowledging Lender's security interest in the Collection Account granted by Borrower in this Agreement and agreeing that Depository Bank will not exercise its right of setoff or otherwise assert any right in sums in the Collection Account constituting Collateral or proceeds of Collateral, and agreeing that upon notice by Lender, Depository Bank will forward to Lender or to the Dominion Account, all sums contained in the Collection Account and all items presented to it for deposit to the Collection Account.  To expedite collection, Borrower shall endeavor in the first instance to make collection of its Accounts for Lender, provided, however, that any amounts received by Borrower on the Accounts or other Collateral shall be held by Borrower in trust for Lender and not commingled with Borrower's funds and shall be deposited promptly in the Collection Account. Borrower shall cause all proceeds of the Collateral and all cash received by it and deposited into any bank account to be deposited into the Collection Account at least once a week.  Funds in the Collection Account shall not be subject to withdrawal by Borrower, but at all times shall be pledged to and under the dominion and control of Lender and may be applied to the Obligations and deposited into the Dominion Account.

{01067940.3}

7.4.2  <u>Verification of Accounts</u>.  Whether or not an Event of Default has occurred, Lender shall have the right, at any time, in its name, or in the name of any designee or representative of Lender or Borrower, to verify with any Account Debtor the validity, amount or any other matter relating to any Accounts by mail, telephone, or otherwise.  Borrower shall cooperate fully with Lender in such verification process.

7.4.3  <u>Dominion Account</u>.  If requested by Lender, Borrower shall establish and maintain a Dominion Account pursuant to a lockbox arrangement acceptable to Lender with a bank selected by Borrower and acceptable to Lender in Lender's sole discretion. The bank holding the Dominion Account must agree to waive any offset rights against the Dominion Account.  Borrower shall issue to such bank an irrevocable letter of instruction directing such bank to deposit all payments or other remittances received in the lockbox to the Dominion Account for application to the Obligations, and Lender may also direct the Depository Bank to transfer all funds in the Collection Account to the Dominion Account and to direct all items received by it for deposit into the Collection Account into the Dominion Account.  All funds deposited in the Dominion Account shall immediately become the property of Lender. Lender assumes no responsibility for such lockbox arrangement, including, without limitation, any claim of accord and satisfaction or release with respect to deposits accepted by the bank through the lockbox arrangement.  [For purposes of calculating the amount of the Loan available to Borrower, such payments into the Dominion Account will be applied (conditional upon final collection) to the Obligations on the Business Day of receipt by Lender of immediately available funds in the Dominion Account provided such payments and notice thereof are received in accordance with Lender's usual and customary practices as in effect from time to time and within sufficient time to credit Borrower's loan account on such day, and if not then, on the next Business Day.  For the purposes of calculating interest on the Obligations, such payments or other funds received will be applied (conditional upon final collection) to the Obligations one (1) Business Day following the date of receipt of immediately available funds by Lender in the Dominion Account provided such payments or other funds and notice thereof are received in accordance with Lender's usual and customary practices as in effect from time to time and within sufficient time to credit Borrower's loan account on such day, and if not, on the next Business Day.]

7.4.4  <u>Notice to Account Debtors</u>.  Borrower shall, as Lender deems necessary, give written notice of Lender's Liens on the Collateral to the Account Debtors in such form and substance as Lender may require.  In addition to its other rights, Lender shall have the right to notify the Account Debtors obligated on any of the Accounts to make payment directly to Lender and to take control of all proceeds of any such Accounts, which right Lender may exercise at any time whether or not an Event of Default exists.  Borrower authorizes Lender to sign and endorse Borrower's name on any check, draft, money order, or other form of payment of any Account item and to sign and endorse satisfactions and releases of Account items in Borrower's name.  The costs of collection and enforcement of the Accounts, including attorney's fees, out-of-pocket expenses and all other expenses and liabilities, shall be borne solely by Borrower whether incurred by Lender or Borrower.

7.4.5  <u>Governmental Accounts</u>. If any of Borrower's Accounts in excess of $5,000 arise out of contracts with the United States or any department, agency, or

instrumentality of the United States, Borrower will immediately notify Lender in writing and execute any instruments and take any steps necessary to perfect Lender's interest in those Accounts, whether required by the Federal Assignment of Claims Act or any other Applicable Law.

   7.4.6   <u>Accounts Evidenced by Instruments</u>.   If any of Borrower's Accounts are evidenced by promissory Note, trade acceptances, chattel paper, chattel mortgages, conditional sales contracts, or other instruments, Borrower will immediately deliver them to Lender, endorsed or assigned with recourse to Lender's order and, regardless of the form of such endorsement or assignment, Borrower hereby waives presentment, demand, notice of dishonor, protest and notice of protest and all other similar notices.

   7.4.7   <u>Limitation of Liability; Waivers</u>.   Lender shall not be liable for failure to collect the Accounts or to enforce any contract rights or for any action or omission on its part or by its officers, agents and employees, except for willful misconduct.   Borrower hereby releases and waives any and all actions, claims, causes of action, demands and suits which it may ever have against Lender as a result of any possession, collection, settlement, compromise or sale by Lender of any of the Accounts, notwithstanding the effect of such possession, collection, settlement, compromise or sale upon the business of Borrower.   Said waiver shall include all causes of action and claims which may result from the exercise of the power of attorney conferred upon Lender in Section 10.5.

   7.4.8   <u>Legend</u>.   Borrower shall either deliver to Lender, at Lender's request, all executed original copies of any Collateral constituting documents, tangible chattel paper or instruments (as defined in the Uniform Commercial Code as enacted in the State of Alabama) or mark conspicuously on each original copy the following legend:

**NOTICE**

**This   Agreement   and   the   rights   of   Maritime Communications/Land Mobile, LLC, to receive all payments hereunder have been assigned to Southeastern Commercial Finance, L.L.C. as collateral security under Loan and Security Agreement dated August __, 2011.**

   Borrower also authorizes Lender to file financing statements describing such Collateral.

   7.5   <u>Discharge of Taxes and Liens</u>.   At its option, and without obligation, Lender may discharge Taxes, Liens, security interests or other encumbrances levied or placed on the Collateral and may pay for the maintenance and preservation of the Collateral.   Borrower shall reimburse Lender, on demand, for any payment made or expense incurred by Lender pursuant to this authorization, including any attorneys' fees incurred by Lender.

   7.6   <u>Complete Records; Inspection Rights</u>.   Borrower will at all times keep accurate and complete records of the Collateral, and Lender shall have the right to call at Borrower's place or places of business at intervals determined by Lender to inspect and examine

{01067940.3}

the Collateral and to inspect, audit, check, and make abstracts from the books, records, journals, orders, receipts, computer printouts, correspondence and other data relating to the Collateral. Lender shall make such inspections at least quarterly, and Borrower shall pay any and all costs and expenses incurred by Lender in connection with such inspections, which fees shall not be less than $100.00 per inspection.

      7.7    Notice/Contracts.  Borrower shall notify Lender promptly in writing of any matters affecting the value, enforceability or collectibility of any of the Contracts, including material defaults, delays in performance, disputes, offsets, defenses, counterclaims, returns and rejections and all reclaimed or repossessed property.

      7.8    Access to Records.  Borrower hereby grants to Lender access to all file cabinets, books, ledgers, microfilm, microfiche, magnetic tapes, magnetic discs, and other information retrieval or storage systems, on which, or in which, any of Borrower's records concerning its Accounts, Inventory, General Intangibles, Equipment, and any other Collateral are kept or stored. Borrower agrees to deliver all of the foregoing property to Lender upon request. Borrower agrees that Lender may come on any premises where any of such property is located at any reasonable time to take possession of such property, and that the entry of such premises and the taking of such property by Lender will not constitute a trespass to, or a conversion of, any such property or premises. Borrower agrees to make all records available to Lender during normal business hours, whether or not an Event of Default exists.

      7.9    Annual Certification.  At least annually, Borrower shall give Lender a certification, in written or other record form, attesting that Borrower has not sold any of the Collateral unless expressly permitted by this Agreement and that Borrower has not changed its legal name without Lender's prior written consent.

      7.10   Business Purpose.  Borrower warrants that the Collateral in which it has granted Lender a security interest secures Loan intended solely for business purposes.

## ARTICLE VIII
## EVENTS OF DEFAULT; CERTAIN REMEDIES

      8.1    Events of Default.  The occurrence of any one or more of the following events shall constitute an Event of Default under this Agreement:

      8.1.1   Payment Default.  If Borrower shall fail to make any payment of any installment of principal, interest or other payment on any Note when and as the same shall become due and payable, whether upon demand, by declaration, upon acceleration, or otherwise; or

      8.1.2   Fees and Expenses.  If Borrower shall fail to pay when due any expense, fee or charge provided for in this Agreement [and such failure shall continue for a period of ten (10) days]; or

      8.1.3   Other Defaults.  If Borrower shall fail for a period of ten (10) days to perform, keep, or observe any other covenant, agreement or provision of this Agreement; or

8.1.4   <u>Representations False</u>.   If any warranty, representation, or other statement made or furnished to Lender by or on behalf of Borrower or any guarantor or in any of the Loan Documents proves to be or subsequently becomes false or misleading in any material respect.

8.1.5   <u>Bankruptcy Defaults</u>.   Upon the occurrence or existence of one of more of the following events shall constitute a bankruptcy event of default:

(a) The appointment of a Chapter 11 trustee;

(b) The appointment of an examiner with any powers other than those set forth in Section 1106(a)(3)-(4), unless Lender consents to such powers;

(c) The conversion of the Bankruptcy Case to Chapter 7;

(d) The dismissal of the Bankruptcy Case;

(e) The Debtor's use of funds, whether from the Loan or otherwise, in a way that deviates from the Budget; or

(f) The granting of relief from the automatic stay to permit any party to recover possession of any property used in the operation of Borrower's business having a value in excess of $100,000.00.

8.1.6   <u>Cancellation of guaranty</u>.   If the cancellation, termination or limitation of any guaranty of Borrower's obligations under this Agreement or the Loan shall occur, or if any such guarantor shall be in default under or breach the terms of any guaranty agreement between Lender and such guarantor; or if any such guarantor should die; or if any subordination agreement executed by any creditor of Borrower or of any such guarantor in favor of Lender should be canceled, terminated, or breached; or if any guarantor's financial condition as represented in the last personal financial statement delivered to and received by Lender is substantially impaired; or

8.1.7   <u>Default on Other Obligations</u>.   If Borrower shall default in payment of more than $5,000.00 due on any Indebtedness of Borrower to others or if Borrower or any guarantor shall default under any loan or security agreement with others or under any material lease involving a payment of more than $3,000.00; or

8.1.8   <u>Judgments</u>.   If a final judgment for the payment of money in excess of $25,000 shall be rendered against Borrower and the same shall remain undischarged for a period of ten (10) days during which execution shall not be effectively stayed; or

8.1.9   <u>Uninsured Losses; Unauthorized Dispositions</u>.   Any material loss, theft, damage or destruction not fully covered by insurance of the Collateral, or sale, lease or encumbrance of any of the Collateral (except as permitted by this Agreement) or the making of any levy, seizure, or attachment on the Collateral; or

8.1.10 <u>Material Adverse Change</u>.   If there shall occur any Material Adverse Change; or

8.1.11 <u>Business Disruption; Condemnation</u>.   If a substantial part of Borrower's business shall cease for more than five (five) days; or Borrower shall suffer the loss or revocation of any license or permit which is necessary to the operation of its business; or Borrower shall be enjoined, restrained or in any way prevented by court, governmental or administrative order from conducting any material part of its business affairs; or any material lease or agreement pursuant to which Borrower leases, uses or occupies any of its properties shall be canceled or terminated prior to the expiration of its stated term; or any part of the Collateral shall be taken through condemnation or the value of such Collateral shall be impaired through condemnation; or

8.1.12 <u>Change in Control</u>.   If any of the present executive officers of Borrower should resign or be removed or if there occurs a change in majority stock ownership of Borrower; or

8.1.13 <u>Facility Lease</u>.   If Borrower should fail to pay or default with respect to any present or future lease agreement for the premises occupied by Borrower; or

8.1.14 <u>Other Documents</u>.   If a default or breach occurs under any other Loan Document (other than the breaches enumerated in Sections 8.1.1 through 8.1.13 above), or with respect to any of the Obligations, or under any other note, evidence of indebtedness, loan agreement, security agreement, guaranty, pledge, mortgage, assignment, or security document executed by Borrower in favor of Lender.

8.2     <u>Bankruptcy Remedies.</u>

8.2.1   Remedies Without Notice or Court Order.   Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without order of or application or motion to the Bankruptcy Court, upon the occurrence and during the continuation of an Event of Default, Lender may, at its election, without notice of its election and without demand, do any one or more of the following, all of which are authorized by Debtor:

(a) Declare all Obligations immediately due and payable;

(b) Cease advancing money or extending credit; or

(c) Terminate this Agreement.

8.2.2   Remedies After Court Order on Limited and Shortened Notice.   Upon the occurrence and during the continuation of an Event of Default, Lender may, at its election, submit to the Bankruptcy Court, on such limited and shortened notice as is set forth in the Interim Financing Order or the Final Financing Order, an order granting relief from the automatic stay under Section 362(d) of the Bankruptcy Code, to permit Lender to do any one or more of the following, all of which are authorized by Debtor:

(a) Require Debtor immediately to surrender possession of the Collateral;

(b) Notify all Account Debtors to send all payments to an address designated by Settle or adjust disputes and claims directly with Account Debtors for amounts and upon terms which Lender considers advisable;

(c) Sell or otherwise dispose of any and all items of Collateral, by public or private sale, in a commercially reasonable manner, upon five days notice to Debtor, and Lender shall have the right to credit bid at any such sale; and

(d) Exercise such other rights and remedies as are available to Lender under the UCC, applicable law or in equity, or pursuant to the Loan Documents or this Agreement.

8.3    Other Remedies/UCC Remedies.    At any time after an Event of Default, Lender may enter upon the premises of Borrower or any other place where any Collateral is located, and through self-help and without judicial process, without first obtaining a final judgment or giving Borrower notice and opportunity for a hearing without any obligation to pay rent, remove the Collateral therefrom to the premises of Lender or its agent for such time as Lender may desire to collect or liquidate the Collateral; render any Equipment unusable; require Borrower to assemble the Tangible Property and make it available to Lender at Borrower's premises or any other place selected by Lender, and to make available to Lender all of Borrower's premises and facilities for the purpose of Lender's taking possession of, removing or putting the Tangible Property in salable form; use, and permit any purchaser of any of the Collateral from Lender to use, without charge, Borrower's labels, General Intangibles and advertising matter or any property of a similar nature, as it pertains to or is included in the Collateral, in advertising, preparing for sale and selling any Collateral, and in finishing the manufacture, processing, fabrication, packaging and delivery of the Inventory; and Borrower's rights under all licenses, franchise agreements and other General Intangibles shall inure to Lender's benefit; and dispose of the Collateral while the Collateral is situated on Borrower's premises.  Lender, without demand of performance or other demand, advertisement or notice of any kind, to the extent permitted by law, of a proposed disposition of the Collateral, which may be given in the manner specified in Section 10.9 or upon Borrower or any other person (all of which demands, advertisements and notices are hereby expressly waived, to the extent permitted by law), may forthwith collect, receive, appropriate, repossess and realize upon all or any part of the Collateral, and may forthwith sell, lease, license, assign, give options to purchase, or sell or otherwise dispose of and delivery all or any part of the Collateral (or contract to do so), in one or more parcels at public or private sale or sales, and any exchange, broker's board or at any of Lender's offices or elsewhere at such prices at Lender may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  Unless the Collateral is perishable or threatens to decline speedily in value, or is of a style customarily sold on a recognized market, Lender will give Borrower reasonable notice of the time after which any private sale or other intended disposition of Collateral is to be made.  The requirement of reasonable notice shall be met if such notice is mailed postage prepaid to Borrower at least ten (10) days before the time of such sale or disposition.  To the extent permitted by law, the Collateral shall be sold free of any right of redemption, which right of redemption Borrower hereby waives and releases.  To the

{01067940.3}

extent permitted by Applicable Law, Borrower waives all claims, damages, and demands against Lender arising out of the repossession, retention or sale of the Collateral. Lender may exercise any rights, powers and remedies of Borrower in connection with any Contract or otherwise in respect of the Collateral, including any rights of Borrower to demand or otherwise require payment of any amount under, or performance of any provision of, any Contract, and to modify, amend, terminate, replace, settle or compromise any Contract or any sum payable thereunder. The Lender may notify Account Debtors that Accounts and Contracts have been assigned to the Lender, demand and receive information from Account Debtors with respect to Accounts and Contracts, forward invoices to Account Debtors directing them to make payments to the Lender, collect all Accounts and Contracts in Lender's or Borrower's name and take control of any cash or non-cash proceeds of Collateral, enforce payment of any Accounts and Contracts, prosecute any action or proceeding with respect to Accounts and Contracts, extend the time of payment of Accounts and Contracts, make allowances and adjustments with respect to Accounts and Contracts and issue credits against Accounts and Contracts, all in the name of Lender or Borrower, settle, compromise, extend, renew, release, terminate or discharge, in whole or in part, any Account or Contract, or deal with the same as Lender may deem advisable and require Borrower to open all mail only in the presence of a representative of Lender, who may take therefrom any remittance on any property. Lender may instruct any holder of any of the Deposit Accounts to pay the balance of such Deposit Accounts to or for the benefit of Lender. Lender may exercise any rights Lender may have under any control agreement relating to the Collateral. Lender may exercise, in addition to all other rights which it has under this Agreement or other Applicable Law, all of the rights and remedies of a secured party upon default under the UCC. Borrower shall pay Lender on demand all expenses, including legal expenses and reasonable attorneys' fees, incurred or paid by Lender in protecting or enforcing the Loan and all other Obligations secured by this Agreement, including its right to take possession of the Collateral.

8.4    <u>Remedies Not Exclusive</u>.  No remedy conferred upon Lender in this Agreement is intended to be exclusive of any other remedy, and each and every remedy shall be cumulative and shall be in addition to every other remedy given in this Agreement or now or hereafter existing in law or in equity.  Lender's exercise or failure to exercise any right shall not affect Lender's subsequent right of Lender to exercise its remedies.

8.5    <u>Waiver of Notice</u>.  Borrower waives notice prior to Lender's taking possession or control of any of the Collateral or any bond or security that might be required by any court prior to allowing Lender to exercise any of Lender's remedies, including, without limitation, the issuance of an immediate writ of possession.

8.6    <u>Application of Proceeds</u>.  Borrower agrees that Lender may apply the net proceeds received from the Collateral among the Loan and the Obligations in its sole discretion. Any proceeds remaining after satisfaction in full of the Loan, the Obligations, and the other obligations and liabilities of Borrower to Lender, shall be distributed as required by Applicable Laws.

# ARTICLE IX
# INDEMNIFICATION

9.1   <u>Indemnification</u>. Borrower agrees to defend, indemnify and hold harmless Lender, its directors, officers, employees, accountants, attorneys, and agents, (the "Indemnitees") from and against any and all claims, demands, judgments, damages, actions, causes of action, injuries, orders, penalties, costs and expenses (including attorneys' fees and costs of court) of any kind whatsoever arising out of or relating to any breach or default by Borrower or any other Person (including any guarantor) under this Agreement or any Loan Document or the failure of Borrower to observe, perform or discharge Borrower's duties under this Agreement or any Loan Document. Without limiting the generality of the foregoing, Borrower's obligation to indemnify Lender shall include indemnity from any and all claims, demands, judgments, damages, actions, causes of action, injuries, orders, penalties, costs and expenses arising out of or in connection with the activities of Borrower, its predecessors in interest, invitees, third parties who have trespassed on Borrower's property, or parties in a contractual relationship with Borrower, whether or not occasioned wholly or in part by any condition, accident or event caused by an act or omission of the Indemnitees, which:  (a) arise out of or relate to the actual, alleged or threatened discharge, dispersal, release, storage, treatment, generation, disposal, or escape of radioactive materials, radioactivity, pollutants or other toxic or hazardous substances, including any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste (including materials to be recycled, reconditioned or reclaimed); or (b) actually or allegedly arise out of or relate to the use, specification, or inclusion of any product, material, or process containing chemicals or radioactive material, the failure to detect the existence or proportion of chemicals or radioactive material in the soil, air, surface water or groundwater, or the performance or failure to perform the abatement of any pollution source or the replacement or removal of any soil, water, surface water, or groundwater containing chemicals or radioactive material; or (c) arise out of or relate to a breach by Borrower of any of the provisions of Section 3.16 relating to Environmental Regulations. In addition, Borrower will indemnify and hold Lender harmless from and against any liability, claim, cost or expense incurred by Lender or imposed against Lender for any stamp tax, intangible tax, or other tax, fee or charge imposed by any governmental entity arising out of or relating to the Note(s), this Agreement, any Loan Document, or the transactions anticipated in this Agreement.

# ARTICLE X
# MISCELLANEOUS

10.1   <u>Term</u>.   This Agreement shall remain in force and effect until the Obligations have been indefeasibly paid or satisfied in full and until Lender has no further obligation to advance funds to Borrower under this Agreement. The indemnities provided for in Article IX shall survive the payment in full of the Loan and the Obligations and the termination of this Agreement.

10.2   <u>Standard of Review</u>.   Any document, writing or instrument required or permitted to be delivered to Lender under this Agreement shall be deemed satisfactory only if approved by Lender in the exercise of its sole discretion, and any act or approval permitted to be done by Lender under this Agreement shall be in Lender's sole discretion.

{01067940.3}

10.3   Costs of Preparation; Brokers Fees.  Borrower shall bear all expenses of Lender in connection with investigation, review and approval of this transaction, the preparation of the Agreement and the Loan Documents, and the issuance and delivery of the Note(s) to Lender and also in connection with any amendment or modification of this Agreement, the Note or any Loan Document, including, without limitation (i) all legal fees and expenses incurred in connection with this transaction, (ii) all travel, appraisal, audit, search and filing fees incurred in connection with this transaction or the administration of the Loan; and (iii) all recording and filing fees, intangibles, taxes, documentary and revenue stamps, other Taxes or other expenses and charges payable in connection with this Agreement, the Note or any Loan Document. Borrower shall indemnify and hold Lender harmless against all broker and finder's fees relating to this transaction.

10.4   Other Costs and Expenses.  If, at any time, whether before or after an Event of Default, Lender employs counsel to advise or represent it with respect to this Agreement or any Loan Document, or to collect the balance of the Loan, or to represent it in any proceeding relating to this Agreement or any of the Loan Documents, or to protect, collect, or liquidate the Collateral or to attempt to enforce any security interest or Lien granted to Lender by Borrower, all of the reasonable attorneys' fees arising from such services, and any expenses, costs and charges relating to those services, shall constitute additional obligations of Borrower payable on demand.

10.5   Attorney-in-Fact.   Borrower hereby irrevocably designates, makes, constitutes and appoints Lender (and all Persons designated by Lender) as Borrower's true and lawful attorney and agent-in-fact, said power to be exercisable by Lender whether or not an Event of Default exists, and Lender, or Lender's agent, may, without notice to Borrower and in either Borrower's or Lender's name, but at the cost and expense of Borrower:  (i) endorse Borrower's name on any checks, Note, acceptances, drafts, money orders or any other evidence of payment or proceeds of the Collateral which come into the possession of Lender or under Lender's control; (ii) demand payment or performance of the Accounts from the Account Debtors, enforce payment of the Accounts by legal proceedings or otherwise, and generally exercise all of Borrower's rights and remedies with respect to the collection of the Accounts; (iii) settle, adjust, compromise, discharge or release any of the Accounts or other Collateral; (iv) sell or collect any of the Accounts or other Collateral upon such terms, and for such amounts and as Lender deems advisable; (v) take possession, in any manner, of any item of payment or proceeds relating to any Collateral and apply the same to the Obligations; (vi) prepare, file and sign Borrower's name to a proof of claim in bankruptcy or similar document against any Account Debtor or to any notice of lien, assignment or satisfaction of lien or similar document in connection with any of the Collateral; (vii) receive, open and dispose of all mail addressed to Borrower and to notify postal authorities to change the address for delivery that mail to any address designated by Lender; (viii) endorse the name of Borrower upon any of the items of payment or proceeds relating to any Collateral and deposit the same to the account of Lender or any other bank on account of the Obligations; (ix) sign, authenticate or endorse the name of Borrower upon any chattel paper (tangible or electronic), document, instrument, invoice, freight bill, bill of lading or similar document or agreement relating to the Accounts, Inventory and any other Collateral; (x) use Borrower's stationery and sign the name of Borrower to verifications of the Accounts and notices to Account Debtors; (xi) use the information recorded on or contained

in any data processing equipment and computer hardware and software relating to the Accounts, Inventory, and any other Collateral and to which Borrower has access; (xii) make and adjust claims under policies of insurance; and (xiii) give instructions and direct any bank or financial institution in which proceeds of the Collateral are deposited to turn over said proceeds to Lender; and (xiv) do all other acts and things necessary, in Lender's determination, to fulfill Borrower's obligations under this Agreement.

10.6    No Waiver.  No waiver of any Event of Default, and no waiver of any default under any other Loan Document shall extend to or shall affect any subsequent or other then existing default or shall impair any of Lender's rights, remedies or powers.  No delay or omission of Lender to exercise any right, remedy, power or privilege after the occurrence of such default or Event of Default shall be construed as a waiver of any such default.

10.7    Headings.    The headings of the articles, sections, paragraphs and subdivisions of this Agreement are for convenience of reference only, are not to be considered a part of this Agreement, and shall not limit or otherwise affect any of the terms of this Agreement.

10.8    No Usury.  In no event shall the amount of interest or fees due or payable on the Loan under this Agreement or the Note exceed the Maximum Rate.  In the event any such payment is inadvertently paid by Borrower or inadvertently received by Lender, such excess sum shall be credited as payment of principal, unless Borrower elects to have such excess sum refunded to Borrower.  It is the express intent of the parties that Borrower not pay and Lender not receive, directly or indirectly, interest in excess of that which may be legally paid by Borrower under Applicable Law.

10.9    Addresses.    Any notice or demand which by any provision of this Agreement is required or provided to be given shall be deemed to have been sufficiently given or served for all purposes by (i) being delivered in person to the party to whom the notice or demand is directed or (ii) by being sent as first class mail, postage prepaid, or by express courier service, in either event to the addresses for each party indicated in the first paragraph of this Agreement.

10.10  CONTROLLING LAW.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ALABAMA; PROVIDED, HOWEVER, THAT IF ANY OF THE COLLATERAL SHALL BE LOCATED IN ANY JURISDICTION OTHER THAN ALABAMA, THE LAWS OF SUCH JURISDICTION SHALL GOVERN THE METHOD, MANNER AND PROCEDURE FOR FORECLOSURE OF LENDER'S LIEN UPON SUCH COLLATERAL AND THE ENFORCEMENT OF LENDER'S OTHER REMEDIES IN RESPECT OF SUCH COLLATERAL TO THE EXTENT THAT THE LAWS OF SUCH JURISDICTION ARE DIFFERENT FROM OR INCONSISTENT WITH THE LAWS OF ALABAMA. BORROWER CONSENTS THAT ANY LEGAL ACTION OR PROCEEDING ARISING UNDER THIS AGREEMENT OR UNDER ANY LOAN DOCUMENT MAY BE BROUGHT, AT THE ELECTION OF LENDER, IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA, OR IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA AND ASSENTS AND SUBMITS TO THE PERSONAL JURISDICTION OF ANY SUCH COURTS IN ANY SUCH ACTION OR PROCEEDING.

{01067940.3}

10.11 <u>Miscellaneous</u>. This Agreement and the instruments and agreements referred to in this Agreement or called for by this Agreement supersede and incorporate all representations, promises, and statements, oral or written, made by Lender in connection with the Loan. This Agreement may not be varied, altered, or amended except by a written instrument executed by an authorized officer of Lender. This Agreement may be executed in any number of counterparts, each of which, when executed and delivered, shall be an original, but such counterparts shall together constitute one and the same instrument. Any provision in this Agreement which may be unenforceable or invalid under any law shall be ineffective to the extent of such unenforceability or invalidity without affecting the enforceability or validity of any other provisions of this Agreement.

10.12 <u>No Obligation to Pursue Others</u>. Borrower agrees that Lender has no obligation to attempt to satisfy the Obligations by collecting them from any other person liable for them and Lender may release, modify or waive any Collateral provided by any other person to secure any of the Obligations, all without affecting Lender's rights against Borrower. Borrower waives any right it may have to require Lender to pursue any other person for any of the Obligations, and that each of the Obligations may be enforced against Borrower without the necessity of joining any guarantor, any other holders of Liens in any Collateral or any other person, as a party.

10.13 <u>Compliance with Other Laws</u>. Lender may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and such compliance will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

10.14 <u>Warranties of Title</u>. Lender may in its sole discretion disclaim any warranties of title or the like in the sale or other disposition of the Collateral. Such disclaimer will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

10.15 <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>. BORROWER AND LENDER HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY PERTAINING OR RELATING TO THIS AGREEMENT, THE NOTE, THE LOAN DOCUMENTS, OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION WITH THIS AGREEMENT OR (B) IN ANY WAY CONNECTED WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES WITH RESPECT TO THIS AGREEMENT, THE NOTE, THE LOAN DOCUMENTS, OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION WITH THIS AGREEMENT OR IN CONNECTION WITH THE TRANSACTIONS RELATED TO THIS AGREEMENT OR CONTEMPLATED BY THIS AGREEMENT OR THE EXERCISE OF EITHER PARTY'S RIGHTS AND REMEDIES, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. BORROWER AND LENDER AGREE THAT EITHER OR BOTH OF THEM MAY FILE A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED

{01067940.3}

AGREEMENT BETWEEN THE PARTIES IRREVOCABLY TO WAIVE TRIAL BY JURY, AND THAT ANY DISPUTE OR CONTROVERSY WHATSOEVER BETWEEN THEM SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

[No Further Text on this Page]

IN WITNESS WHEREOF, each of Borrower and Lender has caused this instrument to be executed by its duly authorized officer and Borrower has caused its seal to be affixed as of the date first above written.

**BORROWER:**

_____

a(n) _____

By: _____

Name: _____

Its: _____

Attest:

_____

**LENDER:**

**SOUTHEASTERN COMMERCIAL FINANCE, L.L.C.**
an Alabama limited liability company

By: _____

Name: _____

Its: _____

Attest:

_____

# EXHIBIT A

## GENERAL DEFINITIONS

When used in the Loan and Security Agreement dated August __, 2011, by and between Southeastern Commercial Finance, L.L.C., ("Lender") and Maritime Communications/Land Mobile, LLC ("Borrower"), the following terms shall have the following meanings (terms defined in the singular to have the same meaning when used in the plural and vice versa):

Unless otherwise defined herein, terms used in this Agreement that are defined in Article 9 of the Alabama Uniform Commercial Code have the meanings defined for them therein.

**Accounts** – means any and all rights of Borrower to the payment of money, whether or not evidenced by an instrument or chattel paper (tangible or electronic) or letter of credit and whether or not earned by performance, including a right to payment for goods sold, leased or licensed or for services rendered and a right to any amount payable under a Contract or a monetary obligation and all "accounts" as defined in Article 9 of the UCC.

**Account Debtor** – any Person obligated on an Account.

**Affiliate** – of any specified person means any other person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified person. For purposes of this definition, "control" when used with respect to any specified person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

**Agreement** – this Loan and Security Agreement.

**Applicable Law** – all laws, rules and regulations applicable to the Person, conduct, transaction, covenant or Loan Document in question, including, but not limited to, all applicable common law and equitable principles; all provisions of all applicable state and federal constitutions, statutes, rules, regulations and order of governmental bodies; and all orders, judgments and decrees of all courts and arbitrators.

**Authorized Representative** – the following, each of whom must be satisfactory to Lender for the specific purposes involved and appropriate to the type of person involved: (1) with respect to a person that is a corporation, the officer or officers of the corporation that are duly authorized to act for the corporation in the specified capacity under Borrower's Governing Documents or Applicable Law; (2) with respect to a person that is a partnership, the general partner or general partners of the partnership that are duly authorized to act for the partnership in the specified capacity under Borrower's Governing Documents or Applicable Law; (3) with respect to a person that is a limited liability company, the member or members of the limited liability company that are duly authorized to act for the limited liability company in the specified capacity under Borrower's Governing Documents or Applicable Law; (4) with respect to a

person that is a natural person, the natural person if competent and authorized to act for himself or herself in the specified capacity under Applicable Law, or if not, any guardian, custodian, personal representative or other person that is authorized to act for such natural person in the specified capacity under Applicable Law; (5) with respect to a person that is a trust, the trustee or trustees of the trust who are duly authorized to act for the trust in the specified capacity under Borrower's Governing Documents or Applicable Law; and (6) with respect to a person that is another type of organization, the officers, directors, managers, officials or other representatives of the organization that are duly authorized to act for the organization in the specified capacity under Borrower's Governing Documents or Applicable Law.

**Average Monthly Loan Balance** – the amount obtained by adding the unpaid balance of the Loan owing by Borrower to Lender at the end of each day during the month in question and dividing such sum by the number of days in such month.

**Bankruptcy Case** – means the case of *In re Maritime Communications/Land Mobile, LLC*; 11-13463 pending in the Bankruptcy Court.

**Bankruptcy Court** – means the United States Bankruptcy Court for the Northern District of Mississippi.

**Borrower** – the person, firm or entity designated as such in the first paragraph of the Agreement.

**Borrower's Governing Documents** – all organizational and governing documents applicable to Borrower. The term includes its certificate or articles of incorporation and bylaws, if a corporation, its partnership agreement, if a partnership, its articles of organization and operating agreement, if a limited liability company, its trust agreement, indenture of trust or other document establishing the trust, if a trust, and all applicable resolutions, consents, or other directions of the directors, shareholders, officers, partners, members, settlers, beneficiaries, owners, or other relevant persons comprising, owning, managing or operating the person in question.

**Borrower's Report** – the Collateral report required to be submitted by Borrower to Lender in accordance with Section 4.15 in the form set forth in **Exhibit G** attached hereto and made a part hereof.

**Business Day** – any day, excluding Saturday and Sunday, on which Lender's main office in Birmingham, Alabama, is open for carrying on substantially all of its business.

**Chattel Paper, Contracts, Documents, Fixtures, General Intangibles, Goods, Instruments** and other terms not specifically defined herein shall have the same respective meanings as are given to those terms in the Uniform Commercial Code as presently adopted and in effect in the State of Alabama (except to the extent that a broader definition is afforded by laws of another jurisdiction, then, with respect to the Collateral the perfection and the effect of perfection or nonperfection is governed by such other jurisdiction, such capitalized words and phrases shall have the meanings attributed to those terms under such other jurisdiction).

**Collateral** – All of the assets of Borrower of every kind, nature and description, wherever located, whether now owned or hereafter acquired, including all of Borrower's assets which are or may be subject to Article 9 of the Uniform Commercial Code of any one or more of the States of the United States of America or any other jurisdiction where any of the foregoing may now or hereafter be located, together with all replacements therefor, additions and accessions thereto, and proceeds (including, but without limitation, insurance proceeds) and products thereof, including, without limitation, the following:

1.  Accounts (including, without limitation, Note, drafts, acceptances, letters of credit, and other rights to payment);

2.  Chattel Paper;

3.  Contracts;

4.  Documents;

5.  Equipment;

6.  Fixtures;

7.  General Intangibles;

8.  Instruments;

9.  Inventory;

10. Investment Property;

11. Tangible Property;

12. Rights as seller of Goods and rights to returned or repossessed Goods;

13. All existing and future leases and use agreements of personal property entered into by Borrower as lessor with other Persons as lessees, including without limitation the right to receive and collect all rentals and other monies, including security deposits, at any time payable under such leases and agreements;

14. Any existing and future leases and use agreements of personal property entered into by Borrower as lessee with other Persons as lessors (to the extent the security interest herein does not constitute a default thereunder), including without limitation the leasehold interest of Borrower in such property, and all options to purchase such property or to extend any such lease or agreement;

15. All moneys of Borrower and all Lender accounts, Deposit Accounts, lock boxes and other accounts in which such moneys may at any time be on deposit or held and all investments or securities in which such moneys may at any time be

invested and all certificates, instruments and documents from time to time representing or evidencing any of the same;

16. All rights, interest, dividends, proceeds, products, rents, royalties, issues and profits of any of the property described in Paragraphs (1) through (15) above, whether the product of sale, lease, license, exchange, or other disposition of the Collateral paid or accruing before or after the filing of any petition by or against Borrower under the United States Bankruptcy Code and all Note, certificates of deposit, checks and other instruments from time to time delivered to or otherwise possessed by Lender for or on behalf of Borrower in substitution for or in addition to any of said property;

17. All of Borrower's rights as an unpaid vendor or lienor, including stoppage in transit, replevin, detinue and reclamation;

18. All supporting obligations;

19. Any other property of Borrower now or hereafter held by Lender or by others for Lender's Account; and

20. All books, records, documents, files and ledgers (whether on computer or otherwise) conveying or otherwise related to any of the property described in the foregoing granting clauses, pertaining to any of the Collateral.

**Collection Account** – Borrower's demand deposit account at Depository Lender, pledged to and under the dominion and control of Lender.

**Contracts** –all Leases, licenses, requisitions, purchase orders, documents, instruments, letters of credit, and chattel paper (tangible or electronic) of Borrower including any of the same that relate to any Equipment, Fixtures, Inventory, General Intangibles or other Collateral, or secure any Accounts or in connection with which Accounts exist or may be created.

**Default Rate** – a rate of interest equal twelve percent (12%) in excess of the Prime-Based Rate calculated daily and computed on the actual days elapsed over a year of 360 days (unless reference to a 365 or a 366-day year is necessary in order not to exceed the highest rate permitted by Applicable Law), said rate to change as and when the Prime-Based Rate changes.

**Deposit Accounts** – all bank accounts and other deposit accounts and lock boxes of Borrower, including those established for the benefit of Lender, including the Collection Account, the Dominion Account, and all "deposit accounts" as defined in Article 9 of the UCC.

**Depository Lender** – Any bank approved by Lender in writing.

**Dominion Account** – a special account in the name of Lender established by Borrower pursuant to the Agreement at a bank selected by Borrower, but acceptable to Lender in

its sole discretion, pledged to and under the dominion and control of Lender, over which Lender shall have sole and exclusive access and control for withdrawal purposes and in which Lender has a first priority perfected security interest.

**Environmental Regulations** – all federal, state and local laws, rules, regulations, ordinances, programs, permits, guidances, orders and consent decrees relating to the environment or to public health, safety and environmental matters, including, but not limited to, the Resource Conversation and Recovery Act, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Toxic Substances Control Act, the Clean Water Act, the Clean Air Act, the River and Harbor Act, the Water Pollution Control Act, the Marine Protection Research and Sanctuaries Act, the Deep-Water Port Act, the Safe Drinking Water Act, the Superfund Amendments and Reauthorization Act of 1986, the Federal Insecticide, Fungicide and Rodenticide Act, the Mineral Lands and Leasing Act, the Surface Mining Control and Reclamation Act, the Oil Pollution Act of 1990, state and federal superlien and environmental cleanup programs and laws, U.S. Department Transportation regulations, laws regulating hazardous, radioactive and toxic materials and underground petroleum products storage tanks, and all similar state, federal and local laws and regulations.

**Equipment** – means all of Borrower's equipment, machinery, furniture, furnishings, vehicles, tools, spare parts, materials, supplies, store fixtures, leasehold improvements, all other goods (including embedded software to the extent provided for in Article 9 of the UCC) of very kind and nature (other than Inventory and Fixtures), and all "equipment" as defined in Article 9 of the UCC.

**Event of Default** – the occurrence of any one or more of the events described in Section 8.1.

**Final Financing Order** – means the final order of the Bankruptcy Court, in form, scope and substance acceptable to Lender, approving this Agreement and the Loan Documents, including the Advances made to or on behalf of Borrower in accordance with this Agreement, substantially in the form of the Interim Financing Order, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of Lender, which order shall be in full force and effect and has not been vacated, modified, amended (without the express written joinder or consent of Lender), reversed, overturned or stayed in any respect, and, in the event that such order is the subject of a pending appeal, the performance of any obligation of Borrower shall not be the subject of a stay pending appeal.

**GAAP** – generally accepted accounting principles in the United States of America in effect from time to time consistently applied.

**General Intangibles** – means all choses in action, things in action, causes of action and other assignable intangible property of Borrower of every kind and nature (other than Accounts and Contracts), including corporate, partnership, limited liability company and other business records, good will, inventions, designs, patents, patent applications, trademarks, trade names, trade secrets, service marks, logos, copyrights, copyright applications, registrations, software, licenses, payment intangibles (to the extent not included in Accounts), permits, franchises, tax refund claims, insurance policies and rights thereunder (including any refunds and

returned premiums) and any collateral, guaranty, letter of credit or other security held by or granted to Borrower to secure payment of Accounts and Contracts, and all "general intangibles" as defined in Article 9 of the UCC.

**Governmental Authority** – means any national, state, county, municipal or other government, domestic or foreign, and any agency, authority, department, commission, bureau, board, court or other instrumentality thereof.

**Governmental Requirement** – means all laws, rules, regulations, ordinances, judgments, decrees, codes, orders, injunctions, notices and demand letters of any Governmental Authority.

**Hazardous Substances** – means all pollutants, effluents, contaminants, emissions, toxic or hazardous wastes and other substances, the removal of which is required or the manufacture, use, maintenance, handling, discharge or release of which is regulated, restricted, prohibited or penalized by any Governmental Requirement, or even if not so regulated, restricted, prohibited or penalized, might pose a hazard to the health and safety of the public or the occupants of the property on which it is located or the occupants of the property adjacent thereto, including (1) asbestos or asbestos-containing materials, (2) urea formaldehyde foam insulation, (3) polychlorinated biphenyls (PCBs), (4) flammable explosives, (5) radon gas, (6) laboratory wastes, (7) experimental products, including genetically engineered microbes and other recombinant DNA products, (8) petroleum, crude oil, natural gas, natural gas liquid, liquefied natural gas, other petroleum products and synthetic gas usable as fuel, (9) radioactive material and (10) any substance or mixture listed, defined or otherwise determined by any Governmental Authority to be hazardous, toxic or dangerous, or otherwise regulated, affected, controlled or giving rise to liability under any Governmental Requirement.

**Indebtedness** - means any (a) obligations for borrowed money, (b) obligations, payment for which is being deferred by more than ninety (90) days, representing the deferred purchase price of property other than accounts payable arising in connection with the purchase of inventory customary in the trade and in the ordinary course of Borrower's business, (c) obligations, whether or not assumed, secured by Liens or payable out of the proceeds or production from the Accounts and/or property now or hereafter owned or acquired, and (d) the amount of any other obligation (including obligations under financing leases) which would be shown as a liability on a balance sheet prepared in accordance with GAAP.

**Interim Financing Order** – means the order of the Bankruptcy Court, substantially in the form as set forth on Exhibit B, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of Lender, which order shall be in full force and effect and has not been vacated, modified, amended (without the express written joinder or consent of Lender), reversed, overturned or stayed in any respect, and, in the event that such order is the subject of a pending appeal, the performance of any obligation of Borrower shall not be the subject of a stay pending appeal.

**Inventory** – means all goods, merchandise and other personal property held by Borrower for sale or lease or license or furnished or to be furnished by Borrower under contracts of service or otherwise, raw materials, parts, finished goods, work-in-process, scrap inventory

and supplies and materials used or consumed, or to be used or consumed, in Borrower's present or any future business, and all such property returned to or repossessed or stopped in transit by Borrower, whether in transit or in the constructive, actual or exclusive possession of Borrower or of Lender or held by Borrower or any other person for Lender's account and wherever the same may be located, including all such property that may now or hereafter be located on the premises of Borrower or upon any leased location or upon the premises of any carriers, forwarding agents, warehousemen, vendors, selling agents, processors or third parties, and all inventory as defined in Article 9 of the UCC.

**Investment Property** – all of Borrower's certificated and uncertificated securities, securities accounts, and security entitlements, commodity accounts and commodity contracts, and all "investment property" as defined in Articles 8 and 9 of the Uniform Commercial Code.

**Leases** - means (1) all leases and use agreements of personal property entered into by Borrower as lessor with other persons as lessees, and all rights of Borrower under such leases and agreements, including the right to receive and collect all rents and other moneys (including security deposits) at any time payable under such leases and agreements, whether paid or accruing before or after the filing of any petition by or against Borrower under the federal Bankruptcy Code; and (2) all leases and use agreements of personal property entered into by Borrower as lessee with other persons as lessor, and all rights, titles and interests of Borrower thereunder, including the leasehold interest of Borrower in such property and all options to purchase such property or to extend any such lease or agreement.

**Lien** – any interest in property (real, personal or mixed, and tangible or intangible) securing an obligation owed to, or a claim by, a Person other than the owner of the property, whether such interest is based on the common law, statute or contract, and including, but not limited to, the security interest, security title or Lien arising from a security agreement, mortgage, deed of trust, deed to secure debt, encumbrance, pledge, conditional sale or trust receipt or a lease, consignment or bailment for security purposes.

**Loan** – the Loan, and any substitutions therefor, extensions, or renewals of the Loan.

**Loan Documents** – this Agreement, the Note, and each and every mortgage, deed of trust, guarantee, note, life insurance assignment, subordination agreement, security agreement, financing statement or other instrument executed and delivered to evidence the Loan or any other Obligation, to constitute collateral for the Loan or any other Obligation, or to evidence security for the Loan or any other Obligation, and any and all other agreements, instruments, and documents heretofore, now or hereafter, executed by Borrower and delivered to Lender in respect to the transactions contemplated by this Agreement.

**Margin Stock** – is defined in Regulation U of the Federal Reserve Board, as amended.

**Material Adverse Change** – the occurrence of an event giving rise to a Material Adverse Effect.

**Material Adverse Effect** – a material adverse effect on (a) the business, condition (financial or otherwise), operations, performance, properties or prospects of Borrower or any guarantor, (b) the rights and remedies of Lender under any Loan Document or (c) the ability of Borrower or any guarantor to perform its Obligations under any Loan Document to which it is or is to be a party.

**Maximum Rate** – the maximum non-usurious rate of interest that now or in the future by Applicable Law may be contracted for, taken, reserved, charged or received on the Indebtedness in question. Notwithstanding any other provision of this Agreement, the Maximum Rate shall be calculated on a daily basis (computed on the actual number of days elapsed over a year of 365 or 366 days, as the case may be).

**Note** – each promissory note executed and delivered by Borrower to Lender evidencing all or part of the Loan.

**OFAC List** - the list of specially designated nationals and blocked persons subject to financial sanctions that is maintained by the U.S. Treasury Department, Office of Foreign Assets Control and any other similar list maintained by the U.S. Treasury Department, Office of Foreign Assets Control pursuant to any Requirements of Law, including, without limitation, trade embargo, economic sanctions, or other prohibitions imposed by Executive Order of the President of the United States. The OFAC List currently is accessible through the internet website www.treas.gov/ofac/t11sdn.pdf.

**Obligations** – (1) the payment of all amounts now or hereafter becoming due and payable under the Loan Documents, including the principal amount of the Loan, all interest (including interest that, but for the filing of a petition in bankruptcy, would accrue on any such principal) and all other fees, charges and costs (including attorneys' fees and disbursements) payable in connection therewith; (2) the observance and performance by Borrower of all of the provisions of the Loan Documents; (3) the payment of all sums advanced or paid by Lender in exercising any of its rights, powers or remedies under the Loan Documents, and all interest (including post-bankruptcy petition interest, as aforesaid) on such sums provided for herein or therein; (4) the payment and performance of all other indebtedness, obligations and liabilities of Borrower to Lender (including obligations of performance) of every kind whatsoever, arising directly between the Borrower and Lender or acquired outright, as a participation or as collateral security from another person by Lender, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter incurred, contracted or arising, joint or several, liquidated or unliquidated, regardless of how they arise or by what agreement or instrument they may be evidenced or whether they are evidenced by agreement or instrument, and whether incurred as maker, endorser, surety, guarantor, general partner, drawer, tort-feasor, account party with respect to a letter of credit, indemnitor or otherwise; and (5) all renewals, extensions, modifications and amendments of any of the foregoing, whether or not any renewal, extension, modification or amendment agreement is executed in connection.

**Permitted Liens** – (i) Liens for Taxes not yet due or which are being contested in good faith by appropriate proceeding and against which reserves deemed adequate by Lender have been set up (excluding any Lien imposed pursuant to any of the provisions of ERISA); (ii) other Liens, charges and encumbrances incidental to the conduct of its business or the ownership

of its property and assets and created by operation of law; (iii) purchase money Liens and encumbrances created to secure the indebtedness permitted by Section 5.2; and (iv) liens and security interests listed on **Exhibit C**.

**Person** – an individual, partnership, corporation, joint stock company, firm, land trust, business trust, limited liability company, unincorporated organization, or other business entity, or a government or agency or political subdivision.

**Prime-Based Rate** – that rate of interest equal to the Prime Rate plus seven percent (7%).

**Prime Rate** – the Prime Rate as reported in the money rates column of the Wall Street Journal, except that if no prime rate is published, the prime rate shall be the highest prime rate or base rate (as determined by Lender) of any bank located in Birmingham, Alabama.

**Solvent and Solvency** – with respect to any Person on a particular date, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including, without limitation, contingent liabilities, of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature and (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

**Subsidiary** – means (1) any corporation more than 50% of whose shares of stock having general voting power under ordinary circumstances to elect a majority of the board of directors, managers or trustees of such corporation (irrespective of whether or not at the time stock of any other class or classes has or might have voting power by reason of the happening of any contingency), are owned or controlled directly or indirectly by Borrower, or (2) any partnership or limited liability company, 50% or more of the partnership or membership interests in which are owned or controlled, directly or indirectly, by Borrower, and includes entities currently or hereafter falling within the categories described above.

**Tangible Property** – all Equipment, Fixtures, Inventory and other tangible personal property of Borrower.

**Taxes** – any present or future taxes, levies, imposts, duties, fees, deductions, withholdings or other charges of whatever nature, including, without limitation, withholding, social security, income, sales, excise, property, payroll, franchise and license taxes, now or hereafter imposed or levied by the United States or any state or political subdivision of the United States or by any foreign government or other taxing authority, and all interest, penalties, additions to tax and similar liabilities with respect thereto.

**UCC** – the Uniform Commercial Code as in effect in the State of Alabama.

**ACCOUNTING TERMS**.   All accounting terms used in this Agreement shall be construed in accordance with GAAP.

**INTERPRETATION**.   Whenever the singular or plural number is used, it shall equally include the other.   All references to statutes and related regulations shall include any amendments and any successor statutes and regulations.   All references to any instruments or agreements, including, without limitation, references to any of the Loan Documents, shall include any and all modifications or amendments and any and all extensions or renewals.

# EXHIBIT B

# BUDGET

# EXHIBIT C

## PERMITTED LIENS

[NONE.]

EXHIBIT D

(Addresses)

1)      Location of any of Borrower's Tangible Personal Property:

EXHIBIT E

1)    Material Contracts

2)    Borrower's Patents, Patent Applications,

3)    Leases in which Borrower is lessor

4)    Leases in which Borrower is lessee

EXHIBIT F

(Ownership Interests in Borrower)

EXHIBIT G

(FORM OF BORROWER'S REPORT)

INTERIM MONTHLY BUDGET

MARITIME COMMUNICATIONS/LAND MOBILE, LLC

DEBTOR IN POSSESSION

BEGINNING DATE AUGUST 1, 2011

USE OF INTERIM DIP FINANCING:

MONTHLY ESSENTIAL EXPENDITURES;

PAYROLL AND REQUIRED DEPOSITS

    SHARON WATKINS

    ROBERT T. SMITH

    JOHN REARDON (CONSULTING/PAYROLL)

PROFESSIONAL FEES                                                  $40,000.00


UTILITIES, PHONES, BUSINESS CELLPHONES              3,000.00


BUSINESS AND HEALTH INSURANCE                      3,500.00


OFFICE SPACE (CLARKSVILLE, IN, ALEXANDRIA, VA)     3,500.00
                                                   _____

TOTAL MONTHLY BUDGETED EXPENDITURES OF EMERGENCY

INTERIM DIP FINANCING                              $50,000.00


EXHIBIT "B"